**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

22ND AVENUE STATION, INC.,
a Minnesota corporation,

        Plaintiff,

v.                                        **MEMORANDUM OF LAW & ORDER**
        Civil File No. 06-495 (MJD/AJB)

CITY OF MINNEAPOLIS,
a municipal corporation,

        Defendant.
_____

Randall D. B. Tigue, Tigue Law Office, Counsel for Plaintiff.

James Anthony Moore and Franklin E. L. Reed, Minneapolis City Attorney's Office, Counsel for Defendant.
_____

## I.    INTRODUCTION

This matter is before the Court on Plaintiff 22nd Avenue Station, Inc.'s

Motion for a Preliminary Injunction[1].  [Docket No. 2]  The Court heard oral

argument on April 14.

---

[1]By a letter dated February 7, 2006, Plaintiff withdrew its motion for a temporary restraining order.

**II.    BACKGROUND**

**A.    Factual Background**

Plaintiff 22nd Avenue Station, Inc., is a Minnesota corporation that operates an establishment named 22nd Avenue Station at 2121 University Avenue Northeast, Minneapolis, Minnesota.  22nd Avenue Station or its predecessor has existed at this location since 1982.  Since 1984, it has offered live semi-nude dancing as entertainment.

Since 1977, Defendant City of Minneapolis ("the City") has had in place various zoning ordinances regulating adult entertainment.  Before February 1992, establishments that served alcohol and featured live nude or semi-nude dancing were not included in the scope of the zoning ordinance addressing adult entertainment.  In February 1992, the City amended its ordinance to redefine the term "adult entertainment center" to include alcohol-serving bars featuring live nude or semi-nude dancing.  Under the new 1992 ordinance, all such establishments were required to be located in the B4 central business district, subject to various other locational restrictions.

The 1992 ordinance did not contain an amortization provision for non-conforming uses.  Thus, Plaintiff was permitted to continue to offer semi-nude dancing as a legal non-conforming use, even though it was located outside the central business district.  One other alcohol-serving establishment that featured

live semi-nude dancing was also located outside the central business district, B.J.'s Bar.

Ten years later, on March 18, 2002, the City Planning Commission held a public meeting to consider amending the 1992 ordinance to provide a one-year amortization period for non-conforming adult entertainment centers, including Plaintiff.  The Planning Department staff report recommended that the amendment be enacted in order to combat harmful secondary effects.  The staff report included various studies on the adverse secondary effects of adult uses: a compendium of reports assembled for the Minnesota Attorney General in 1989 including a 1980 Minneapolis study and a 1978 St. Paul study, a 1996 study from Newport News, Virginia, a 1986 report from Austin, Texas, and a 1984 report from Indianapolis, Indiana.

The Planning Commission voted to support the amendment.  In April 2002, the City Counsel enacted Ordinance No. 2002-OR-030, which provided for amortization of non-conforming adult entertainment centers by May 1, 2003. The 2002 ordinance also provided that "[t]he city council may extend the date upon which a nonconforming use becomes unlawful under this section where it is established that the amortization period is unreasonable as applied to a particular use."  The 2002 amendment only affected two establishments - Plaintiff and B.J.'s.

None of the evidence considered by the City Counsel or Planning

Commission specifically related to the two affected adult entertainment establishments. At the March 18, 2002, public hearing, B.J.'s attorney testified that there was no evidence that B.J.'s caused any harmful secondary effects. B.J.'s owner testified that B.J.'s had virtually no 911 calls since 1985; had installed four security cameras, fencing, and lighting; and was the safest location on Broadway Avenue between I-94 and the Mississippi. The attorney for 22nd Avenue Station testified that there was no empirical evidence that the two establishments were causing secondary effects. A neighbor of 22nd Avenue Station testified regarding the positive impact it had on the neighborhood.

On August 15, 2003, the Minneapolis Zoning Inspector notified Plaintiff that it was a nonconforming use and gave Plaintiff until September 14, 2003 to cease offering semi-nude dancing or apply for an extension. On September 4, 2003, Plaintiff applied for an extension of the amortization period.

The City referred Plaintiff's request for an extension to an Administrative Law Judge. On December 15, 2005, the ALJ issued Findings of Fact and Recommendations, recommending that the City deny Plaintiff's request for an extension. On January 27, 2005, the City Council adopted the ALJ's recommendation.

**B.      Evidence Not Presented Before Enactment**

In support of its motion for a preliminary injunction, Plaintiff presents

4

additional evidence that it did not present at the pre-enactment public hearing.  It

submits the affidavit of planner R. Bruce McLaughlin.  The affidavit critiques the

studies upon which the City relied when passing the 2002 ordinance and includes

a 1995 study from Evansville, Indiana, and a 2001 study from Fulton County,

Georgia.  It also studies Plaintiff's effect on its neighborhood in Minneapolis.

According to the affidavit, property values in Plaintiff's area increased at a rate

higher than in one control area and lower than in the other.  Owner turnover in

the subject area was more stable than one control area and less stable than in

another.  The affidavit also states that the owner occupancy level in the subject

area is midway between the levels in the two control areas.  Finally, McLaughlin

avers that, during the years before the City enacted the 2002 ordinance, the

number of police calls for 22nd Avenue Station was lower than for a number of

other neighboring establishments.

In addition to the affidavit, Plaintiff submits evidence that the City has

placed thirty cameras downtown to prevent crime, but has not placed any of the

cameras in an area that would focus on the entrance of any of the downtown

adult entertainment establishments.  Plaintiff also submits an article entitled

"Government Regulation of 'Adult' Businesses Through Zoning and Anti-Nudity

Ordinances: Debunking the Legal Myth of Negative Secondary Effects" by Bryant

Paul, Daniel Linz, and Bradley J. Shafer.  The article, which has been submitted in

various other zoning cases, critiques the studies generally relied upon by municipalities to regulate adult businesses, including the studies relied upon by Minneapolis.  It concludes that the studies fail to follow the scientific method and are seriously flawed.

### C.    Procedural History

Plaintiff filed this lawsuit against the City on February 6, 2006.  It alleges that the 2002 ordinance violates the First Amendment and that the amortization period is unreasonable.  On that same date, it filed a motion for a temporary restraining order and a preliminary injunction.  After reaching an agreement with the City that the City would not enforce the 2002 ordinance until this Court had decided the motion for a preliminary injunction, Plaintiff withdrew its motion for a temporary restraining order.  The motion for a preliminary injunction is now before the Court.

## III.   DISCUSSION

### A.    Standard

The Eighth Circuit Court of Appeals has established the standard for considering preliminary injunctions and temporary restraining orders.  Dataphase Sys. Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  This Court must consider (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm suffered by the moving party if injunctive

6

relief is denied as compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits. Id.

"[A] preliminary injunction motion is too early a stage of the proceedings to woodenly assess a movant's probability of success on the merits with mathematical precision." General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 624 (8th Cir. 1987). "[W]here the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation." Dataphase Sys., Inc., 640 F.2d at 113.

**B.    Success on the Merits**

**1.    Introduction**

Semi-nude dancing is expressive conduct protected by the First Amendment. BZAPS, Inc. v. City of Mankato, 268 F.3d 603, 605 (8th Cir. 2001). However, a local government such as the City may use its zoning powers to limit the location of an adult entertainment establishment. Id. Such a zoning ordinance is valid if it 1) "is constructed without reference to content;" 2) "is designed to promote a substantial governmental interest;" and 3) "allows reasonable alternative avenues for communication." Id. (citations omitted).

When a zoning ordinance restricts the location of a specific adult use, such as semi-nude dancing, and treats that use differently than other entertainment

7

establishments, it may nevertheless be content-neutral if it is not aimed at the

content of the speech but rather at the secondary effects of the businesses on the

surrounding community.  <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41,

47-48 (1986).

The parties do not dispute that cities may apply zoning ordinances to

existing adult businesses through amortization periods.  <u>See, e.g.</u>, <u>Ambassador</u>

<u>Books & Video, Inc. v. City of Little Rock, Ark.</u>, 20 F.3d 858, 865 (8th Cir. 1994)

(upholding application of three-year amortization period to existing adult

businesses).  At this stage in the proceedings, the parties do not focus their

dispute on whether the 2002 ordinance is content neutral and allows reasonable

alternative avenues for communication.  Instead, they dispute whether the

ordinance is designed to promote a substantial governmental interest.  That is the

factor that the Court addresses today.

**2.   Whether the Ordinance Was Designed to Promote a
Substantial Governmental Interest**

**a.   Burden-shifting Test**

The parties' main dispute is whether the City has provided sufficient

evidence that the 2002 ordinance was designed to promote the substantial

governmental interest of combating negative secondary effects.  The Supreme

Court has laid out a burden-shifting analysis that applies to this prong of the test:

[A] municipality may rely on any evidence that is reasonably believed

8

to be relevant for demonstrating a connection between speech and a
substantial, independent government interest.  This is not to say that
a municipality can get away with shoddy data or reasoning.  The
municipality's evidence must fairly support the municipality's
rationale for its ordinance.  If plaintiffs fail to cast direct doubt on this
rationale, either by demonstrating that the municipality's evidence
does not support its rationale or by furnishing evidence that disputes
the municipality's factual findings, the municipality meets the
standard . . .  If plaintiffs succeed in casting doubt on a municipality's
rationale in either manner, the burden shifts back to the municipality
to supplement the record with evidence renewing support for a
theory that justifies its ordinance.

City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 438-39 (2002)  (citations

omitted).

### b.      Whether the City's Evidence Fairly Supports Its Rationale

"[I]n terms of demonstrating that such secondary effects pose a threat, the

city need not conduct new studies or produce evidence independent of that

already generated by other cities to demonstrate the problem of secondary effects,

so long as whatever evidence the city relies upon is reasonably believed to be

relevant to the problem that the city addresses."  City of Erie v. Pap's A.M., 529

U.S. 277, 296 (2000) (citation omitted).  Thus, generally, a city does not need to

study evidence of adverse secondary effects within itself, but may rely on previous

cities' findings.

Plaintiff acknowledges this general rule, but asserts that when a city

amends an ordinance to affect pre-existing adult entertainment establishments

9

that have been exempted from regulation for a decade, it should be required to

rely on data from its own municipality analyzing the effects that those businesses

have had on their neighborhoods, rather than on outdated studies from other

jurisdictions.  It claims that the only type of evidence that the City could

reasonably believe to be relevant to support its actions would be evidence

showing that, after ten years, the non-conforming uses were in fact causing

adverse secondary effects and the existing zoning regulations were inadequate to

address those effects.  See XLP Corp. v. County of Lake, 743 N.E.2d 162, 170 (Ill.

App. Ct. 2000) (holding that, on the pleadings, "where plaintiffs had been in

business for 15 years at the time defendant enacted its ordinance, plaintiffs'

allegation that defendant wrongly relied on outside studies instead of considering

plaintiffs' existing businesses to determine whether such businesses cause adverse

secondary effects presented an issue of fact").

     However, the case law is clear that, in meeting its initial burden under the

Alameda test, a city is not compelled to conduct its own empirical studies before

applying zoning restrictions to existing adult uses.  See, e.g., Ctr. for Fair Pub.

Policy v. Maricopa County, Az., 336 F.3d 1153, 1168 (9th Cir. 2003) (holding that

the government has no duty to present "empirical data in support of its

rationale"); Flanigan's Enters., Inc. of Ga. v. Fulton County, Ga., 242 F.3d 976, 986

(11th Cir. 2001) (recognizing that a municipality "is not required to perform

empirical studies" before enacting restrictions on adult entertainment).

Although the City's evidence of adverse secondary effects is not strong, before enacting the 2002 ordinance, it examined multiple studies from other jurisdictions that supported its rationale. No contrary studies or evidence critiquing the studies upon which the City relied were presented at the public hearing on the amendment. Cf. Flanigan's Enters., 242 F.3d at 986 (holding that, although municipality is not required to conduct its own studies, "having done so, [it] cannot ignore the results" and "that it was unreasonable for [it] to rely on remote, foreign studies concerning secondary effects when [its] own current, empirical data conclusively demonstrated that such studies were not relevant to local conditions") (footnote omitted). The City is not required to gather evidence in the best manner or to pay for a new local study before amending its zoning ordinance in order to meet its initial burden under the Alameda test. At this stage in the proceedings, the evidence is sufficient to meet the minimal burden placed upon the City.

### c.   Whether Plaintiff Has Cast Doubt on the City's Rationale

As the Supreme Court explained in Alameda, even if the City has made a facially sufficient factual showing to justify its ordinance, the affected party may cast direct doubt on the City's rationale by showing that the City's evidence does not support its rationale or by furnishing evidence that disputes the City's factual

11

findings.  City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 438-39 (2002).

If the affected party succeeds in casting direct doubt, "the burden shifts back to

the municipality to supplement the record with evidence renewing support for a

theory that justifies its ordinance."  Id.

　　　　Plaintiff has presented sufficient evidence to cast direct doubt on the City's

rationale.  It has submitted both an expert affidavit and a peer-reviewed study

casting grave doubt on the reliability of the foreign studies upon which the City

relied.  It has submitted its own recent expert analysis of Plaintiff's impact on

crime, property values, and blight in its surrounding neighborhood, which shows

that Plaintiff has not caused the secondary effects that the City seeks to combat.

The City has provided no contrary evidence regarding the impact of 22nd Avenue

Station on its neighborhood.

　　　　The situation is similar to that facing the Eleventh Circuit Court of Appeals

in Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Fla., 337 F.3d 1251

(11th Cir. 2003).  In Peek-A-Boo Lounge, the court addressed a zoning ordinance

regulating the layout of adult entertainment establishments and a public nudity

ordinance.  The court noted that the question of whether an ordinance is

designed to serve the government's interest in combating negative secondary

effects - asked in adult use zoning cases -  is "virtually indistinguishable" from the

question of whether the ordinance furthers that interest - asked in public nudity

ordinance cases.  Id. at 1264-65.

When passing the public nudity ban, the county relied on its determination that public nudity caused prostitution, sexual assaults, and other criminal activity; and on a report by the Florida Family Association containing testimony from the sheriff of a nearby county that nude dancing establishments caused prostitution, sexual contact, and lewd acts and from the nearby county health department stating that these establishments caused unprotected sexual activity and communicable diseases.  Id. at 1269-70.  The court held that this evidence satisfied the county's pre-enactment burden.  Id. at 1270.  The adult lounges in the case provided evidence such as satisfactory health and safety inspection reports for their businesses, evidence that the crime rate was lower near their businesses than in surrounding areas, and evidence that property values had increased near their businesses.  Id.  The lounges also submitted expert studies purporting to show that their businesses had no negative secondary effects in the affected county.  Id.

The court held that the lounges' evidence was sufficient to cast direct doubt on the county's rationale for enacting the ordinance.  Id. at 1271-72.  It concluded that summary judgment was inappropriate because, "as the record now stands, we have before us an ordinance adopted only on the basis of speculative findings and outdated, foreign studies whose relevance to local conditions appears

13

questionable in light of current data Appellants have placed in the record suggesting that plaintiffs' businesses, which have operated continuously in Manatee County for over fifteen years, do not cause secondary effects." Id. at 1272.

Although the City was not required to conduct its own empirical studies before passing the 2002 ordinance, it cannot rely on shoddy, irrelevant studies to justify its passage.  At this point in the litigation, Plaintiff's relevant, local evidence and expert analyses raise serious questions regarding the City's factual findings. See, e.g., Daytona Grand, Inc. v. City of Daytona Beach, Fla., 410 F. Supp. 2d 1173, 1188 (M.D. Fla. 2006) (holding, after a bench trial, county's public nudity statute unconstitutional based on plaintiffs' expert testimony discrediting county's anecdotal evidence and "highly unreliable data" and plaintiffs' own local studies showing no secondary effects).

Furthermore, this case is distinguishable from SOB, Inc. v. County of Benton, 317 F.3d 856 (8th Cir. 2003).  In SOB, the Eighth Circuit Court of Appeals addressed whether an adult business had cast doubt on the county's foreign study evidence justifying a public nudity ban.  The adult business presented evidence that, despite existing in the county for eight years, adult entertainment businesses in the county had not caused higher crime rates nor lowered property values.  Id. at 862-63.  Proponents of the ordinance submitted contrary evidence.  Id. at 863

14

n.2.  The adult business also presented the Paul, Linz, and Shafer article critiquing

the methodologies of secondary effects studies created by other municipalities.

Id. at 863.

The court concluded that the adult business's evidence was insufficient to

cast doubt on the county's rationale because the evidence that it presented was

particularly related to zoning, not to a nudity ban:

> [SOB's] local evidence addressed only two adverse secondary effects,
> property values and crime in the vicinity of an adult entertainment
> establishment.  These are issues particularly relevant to zoning.  A
> ban on live nude dancing, on the other hand, may address other
> adverse secondary effects, such as the likelihood that an
> establishment whose dancers and customers routinely violate
> long-established standards of public decency will foster illegal activity
> such as drug use, prostitution, tax evasion, and fraud.  Moreover,
> zoning restrictions typically impact a broad range of adult
> entertainment businesses, whereas a ban on live nude dancing
> imposes a de minimis restriction on expressive conduct, while
> otherwise 'leaving the quantity and accessibility of speech
> substantially intact.'

Id. (footnote and citation omitted).

Because the ordinance at issue in this case **is** a zoning ordinance, Plaintiff's

evidence focusing on the secondary effects of property values, crime in its vicinity,

and blight, is particularly relevant and addresses precisely the secondary effects

that the City allegedly sought to combat.  Thus, SOB does not control the Court's

decision.

Plaintiff has at least raised "questions so serious and difficult as to call for

more deliberate investigation." Plaintiff's submissions tend to show that all local evidence regarding the continued existence of B.J.'s and 22nd Avenue Station demonstrate no harmful secondary effects. The City has presented no contradictory evidence whatsoever regarding their effects on the neighborhood, despite the fact that both establishments have existed in their current locations for decades. Additionally, Plaintiff has presented expert evidence raising substantial questions about whether the studies upon which the City did rely were shoddy.

At this stage in the proceedings, the Court does not conclusively decide whether or not the 2002 ordinance is constitutional. However, Plaintiff has raised serious doubt as to whether the 2002 ordinance will pass constitutional muster. The Court must balance this factor with the remaining Dataphase factors to determine whether an injunction should issue.

### C.    Irreparable Harm

Plaintiff has demonstrated that it faces irreparable harm if the injunction does not issue. Without the preliminary injunction, Plaintiff must discontinue offering semi-nude dancing or relocate. Either of these actions is likely to force Plaintiff out of business. This result would clearly constitute irreparable harm. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 420 (8th Cir. 1987); Packard Elevator v. I.C.C., 782 F.2d 112, 115 (8th Cir. 1986). Additionally, without the injunction, Plaintiff faces the choice of abandoning its constitutionally protected

16

activity or facing possible criminal prosecution.  "Loss of first amendment

freedoms constitutes an irreparable injury."  <u>Bukaka, Inc. v. County of Benton</u>, 852

F. Supp. 807, 811 (D. Minn. 1993) (citing <u>Elrod v. Burns</u>, 427 U.S. 347, 373

(1976) (plurality opinion)).

> ### D.    Balance of the Harms

The balance of the harms weighs in favor of granting the preliminary

injunction.  Although the City presents an important interest in enforcing its

zoning code to protect the welfare of its citizens, the balance of the harms favors

Plaintiff.  The risk of irreparable harm to Plaintiff is great - it faces the extinction

of its business and suppression of its protected expression; Plaintiff has raised a

serious question regarding the constitutionality of the 2002 ordinance; Plaintiff

has existed as a nonconforming use at its current location for over a decade; and

the City presents no evidence that a short delay in enforcing the zoning ordinance

will cause particular harm at this point in time.

> ### E.    Public Interest

The City has demonstrated an important public interest in protecting the

welfare of its residents by enforcing its zoning code.  However, given the grave

danger of irreparable harm and Plaintiff's showing of a substantial question

regarding the constitutionality of the ordinance, the Court concludes that the

public interest favors protecting First Amendment expression.  <u>See</u> <u>Mga Susu, Inc.</u>

v. County of Benton, 853 F. Supp. 1147, 1154 (D. Minn. 1994) ("[T]he public

interest favors preventing enforcement of an ordinance that unconstitutionally

restrains protected expression.").

 Weighing the above factors, the Court concludes that a preliminary

injunction is warranted.  Plaintiff has raised a serious question as to whether the

ordinance is unconstitutional.  Plaintiff faces substantial irreparable injury, while

the City faces no immediate threat from a nonconforming use that it has

permitted to exist for over a decade.

 **F.**  **Bond**

 Federal Rule of Civil Procedure 65(c) requires an applicant for a preliminary

injunction to post security "in such sum as the court deems proper, for the

payment of such costs and damages as may be incurred or suffered by any party

who is found to have been wrongfully enjoined or restrained."

 Plaintiff requests that the Court waive the security requirement because the

preliminary injunction will cause no harm to the City.  See Bukaka, 852 F. Supp. at

813 (waiving security requirement when "no demonstrable harm will befall

[county] if it is wrongfully restrained from enforcing the code pending the

outcome of this action;" "plaintiff seeks to vindicate important first amendment

rights;" and "[r]equiring it to provide a security could prevent judicial review of

the code's constitutionality").  The City has not addressed this issue or attempted

18

to quantify any dollar amount of harm that it may face from a wrongly issued injunction.  Because the City has not objected to Plaintiff's request to waive the security requirement, and because Plaintiff has already existed as a nonconforming use in its current location for more than a decade, the Court exercises its discretion to waive the security requirement in this case.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for a Preliminary Injunction [Docket No. 2] is **GRANTED** as follows:

       a.    Defendant City of Minneapolis is hereby enjoined from taking any action, civil, criminal, or administrative, to enforce the provisions of Minneapolis Ordinance 2002-OR-030 against Plaintiff 22nd Avenue Station, Inc.

       b.    The security requirement of Federal Rule of Civil Procedure Rule 65(c) is waived.

2.    This Order is effective upon the date recited below and shall remain in effect until this action is terminated, or until otherwise ordered by the Court.

Dated: April 24, 2006                          s / Michael J. Davis
                                               Judge Michael J. Davis
                                               United States District Court